IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

Virgil Wilkinson, Charles        )
Wilkinson, Alva Rose Hall,       )
Wilbur D. Wilkinson,             )
for themselves and as heirs of   )
Ernest Wilkinson, Mollie         )
Wilkinson, Harry Wilkinson, and  )
Virginia Wilkinson,              )
                                 )    Case No. 1:03-cv-02
                    Plaintiffs,  )
                                 )
        vs.                      )
                                 )
United States of America,        )
                                 )
                    Defendant.   )

**<u>Memorandum Opinion and Order</u>**

The Plaintiffs (collectively "the Wilkinsons") have sued the United States, alleging trespass of several family allotments, conversion of farm equipment, intentional infliction of emotional distress ("IIED"), and wrongful death in the death of Ernest Wilkinson, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. ch. 171.  The Court held a bench trial May 15-17, 2007.  The Court enters this Memorandum Opinion and Order as its findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).  The Court finds that the United States has injured the Wilkinsons in its trespass and conversion of real and personal property and by intentionally inflicting emotional distress.  The Court **ORDERS** the United States to pay the Wilkinsons $459,976 in damages.

## I.   Facts

The Wilkinsons are members of the Three Affiliated Tribes ("the Tribe") at the Fort Berthold Indian Reservation in North Dakota.  Ernest and Mollie Wilkinson, husband and wife, owned several descendable possessory interests on allotted Indian land the Bureau of Indian Affairs ("BIA") held in trust for them. Ernest and Mollie farmed on these allotments.  Four of their sons--Wilbur, Charles, Virgil, and Harry--and two daughters--Alva Rose Hall and Virginia--joined the farming operation.  The crops grown on the farm varied but generally included durum wheat, spring wheat, oats, and flax.  The Wilkinsons also participated in the Tribe's cattle relending program.  Under this program, the Tribe would loan cattle to farmers and ranchers, and the ranchers could keep the calves born of the borrowed cattle.  Allotments 208A-A (described during trial as the "Home Place" or the "Yellow House"), 322A, 371, 1357, 1366 (including 1366-A, which was described during trial as the "White House"), and 3016 (a/k/a 176A) made up a portion of the Wilkinsons' farming operation. Mollie owned allotments 322A, 371, 1357, and 3016.  Ernest owned allotments 208A-A and 1366 (Exh. P-1).

During the 1970's and 1980's, Ernest and Mollie mortgaged the allotments to the Farmers Home Administration (n/k/a and referred to in this opinion as the Farm Services Agency ("FSA")) as provided by 25 U.S.C. § 483a.  The loans included an assignment of income generated from the land.

2

Ernest and Mollie soon defaulted on the debt.  In 1990, the FSA adjusted Ernest's and Mollie's debt through a write-down, reducing the debt to the fair market value of the land.  The write down helped little because soon after the debt again exceeded the value of the land.  The Wilkinsons also defaulted on the renegotiated debt.  The last payment made on the FSA debt was in 1992.

Mollie died in September 1991.  The Department of the Interior probated her estate, and in October 1993, it issued its Order Approving Will and Decree of Distribution and Notice, ordering the distribution of Mollie's assets (Exh. P-7).  Under the distribution, allotment 1366-A passed to Ernest, allotment 3016 passed to Harry, allotments 371 and 1357 passed to Virginia.  Allotment 322A passed under the residuary clause of Mollie's will to Virgil and Charles (Exh. P-7).  However, this distribution did not occur until February 25, 2003, after this lawsuit was commenced.

In 1993, Ernest suffered a stroke and heart attack.  He moved from the farm to Parshall, North Dakota, to be close to medical care.  Wilbur and Charles Wilkinson testified that Ernest was still involved in the farming operation as a supervisor and advisor.

Harry died in August 1994.  The Department of the Interior probated Harry's estate, and in the Department's probate order of August 31, 1998, Ernest was named as Harry's sole heir (Exh. P-8).  All of Harry's assets passed to Ernest.

These family tragedies took their toll on the farming operation.  The Wilkinsons admit they actively farmed very little by 1996.  In August 1996, the FSA sent a letter to the BIA regarding the Wilkinsons' allotments, stating it had not received any recent payments and asking for aid in collecting on the Wilkinsons' debt (Exh. P-13).  The BIA advertised the allotments for lease bids the following February (Exh. D-510 pp.2-3).  In March 1997, Fort Berthold Superintendent Adeline Brunsell sent a letter to Ernest informing him that several of the Wilkinsons' allotments were being advertised for lease (Exh. P-13).  Ernest responded by sending a letter to the BIA asking it not to advertise the allotments for lease because the Wilkinsons planned to farm the land that year (Exh. P-14).  The BIA refused (Exh. P-15) and leased the allotments.  Ernest appealed the BIA's decision to lease the allotments (Exh. P-16).  In June 1997, BIA Area Director Gary Foell denied Ernest's appeal, stating the leases were justified under the FSA loan's assignment of income (Exh. P-19).

By this time, the Wilkinsons had abandoned their farming operation and equipment and moved out of the Yellow House on 208A-A because without these allotments, they believed they did not have sufficient property to farm.  Allotments 1366, 3016, 371, and 1357 were leased to local non-Indian farmers for a five year term, 1997-2001.  Allotment 208A-A was not leased because no bids were received (Exh. D-510-15).  According to the United States, Allotment 322A was leased in a privately negotiated

contract between Charles and Virgil and a local non-Indian
farmer.

Charles and Virgil testified, however, that the BIA leased
322A.  Exhibit D-523 is the lease agreement for allotment 322A
for the 1997-2001 and 2002-2003 leases.  The non-Indian lessee
and the acting superintendent of the Fort Berthold reservation
signed the agreement.  Charles and Virgil never signed the
agreement, nor do their names appear anywhere in the document.
The agreement says only, "THIS CONTRACT, made and entered into
this 26th day of December, 1996, by and between the Indian or
Indians named below (the Secretary of the Interior acting for and
on behalf of the Indians). . . ."  However, the first page of the
lease states it was "negotiated," as opposed to "bid" as the
other leases indicate.  The BIA's advertisement for bids does not
list 322A as one of the available allotments.  As expected, the
Wilkinsons testified they did not privately negotiate the lease
of allotment 322A, and the United States' witnesses, including
Superintendent Brunsell, testified the Wilkinsons privately
negotiated the lease.  However, Duane Risen, the lessee who
farmed 322A, testified he negotiated the lease with Ernest.  He
also testified his son continues to farm 322A and negotiated the
lease with Wilbur.  Exhibit D-576 is the 2002-2007 lease.  Part
of the exhibit is an "Acceptance of Lessor to be Attached to
Farming and/or Pasture Lease."  Charles and Virgil both signed
that document.  All of this is strong evidence the 322A leases
were privately negotiated by the Wilkinsons and signed for by the

BIA.  The Court finds that Allotment 322A was leased in a private lease the Wilkinsons negotiated with the lessee.  The BIA did not lease allotment 322A.

Ernest appealed Foell's decision to the Department of the Interior's Interior Board of Indian Appeals ("IBIA").  In July 1998, the IBIA concluded the BIA had no authority to lease the Wilkinsons' allotments (Exh. P21).  It held Mollie's heirs had been determined in October 1993 when the administrative law judge ordered the distribution of Mollie's estate.  The BIA's failure to distribute the property and close the estate was irrelevant. The IBIA reversed and remanded the BIA leases.  The BIA communicated the IBIA's decision to Superintendent Brunsell (Exh. P-22), but Fort Berthold took no action to effectuate the IBIA's decision.  The BIA or Fort Berthold did not appeal the IBIA decision and it became the law of the case.

Ernest, however, did not live to see his victory with the IBIA.  He died in November 1997.  A probate of Ernest's estate was not opened until 2003 after this lawsuit began, and a dispute arose between Charles, Virgil, and Wilbur regarding the estate. In October 2004, Wilbur, Charles, and Virgil entered into a settlement agreement of Ernest's estate (Exh. P-10).  Under the agreement, Wilbur, Charles, and Virgil each took one-third of their father's estate including any interest in the allotments in dispute here.

Virginia died in November 1998.  The Department of the Interior probated her estate.  In September 2003, the

administrative law judge issued an Order Determining Heirs and
Decree of Distribution for Virginia's estate (Exh. P-9).   Under
the order, Wilbur, Charles, Virgil, Alva Rose Hall, and two
brothers, whom are not parties to this lawsuit, were determined
as heirs and each received a one-sixth share of Virginia's
estate.

The BIA leased Allotments 1366, 371, and 1357 again in 2002
to local non-Indian farmers (Exhs. D-577 and D-578).   These
leases were two-year leases, ending December 31, 2003.   On
January 17, 2003, the BIA sent a letter to lessees stating it no
longer possessed authority to lease the allotments (Exh. P-24).
However, on March 24, 2003, the BIA sent another letter to the
lessees stating it did in fact have authority to lease the
allotments, citing its "authority to grant leases to allotments
where the heirs have yet to be determined." (Exh. P-25).

William Huesers, one of the lessees, testified that he
leased and farmed Allotments 1357 and 371 in 2004, although no
lease agreements were presented as evidence of that.   The Court
inquired into who farmed the allotments in 2005 and 2006, but it
never received a definitive answer.   From what the Court can find
from the evidence before it, the allotments were not leased or
farmed in 2005 and 2006.   The land sat idle.

The Wilkinsons brought this lawsuit, claiming trespass of
the allotments, conversion of farm equipment, intentional
infliction of emotional distress, and wrongful death for the
death of Ernest (doc. #1, #106).   The District Court granted the

7

United States' Motion for Summary Judgment, holding the Wilkinsons did not have standing to sue. <u>Wilkinson v. United States</u>, 314 F. Supp. 2d 902, 911 (D.N.D. 2004). The Eighth Circuit Court of Appeals reversed, holding the Wilkinsons did have standing. <u>Wilkinson v. United States</u>, 440 F.3d 970, 979 (8th Cir. 2006). The Eighth Circuit also held the unappealed decision of the IBIA was entitled to respect and was the law of the case. <u>Id.</u> at 976-77. Therefore, the 1997 leases were unlawful because the BIA acted without authority. <u>Id.</u> The Eighth Circuit did not decide the issue of whether the BIA became vested with the authority to lease the allotments at some later date as a result of several of the Wilkinsons passing away. <u>Id.</u> at 796 n.6. The Circuit guided the remand of this case by outlining two issues: "[1] whether the initial actions of BIA personnel, taken without legal authority, comprised a federal tort or constitutional violation, and [2] whether those actions remained devoid of authority for the entire term of the BIA's seizure." <u>Id.</u> Those are the primary issues this Court is faced with following the bench trial.

## II. Discussion

The Wilkinsons have claimed trespass, conversion, IIED, and wrongful death as theories for recovery. The Court applies North Dakota state law to these causes of action. Each claim will be addressed in turn.

### A.    Trespass

Under North Dakota law, trespass occurs when an actor intentionally and without privilege enters the land of another or causes a thing or third person to do so.  Tibert v. Slominski, 2005 ND 34, ¶ 15, 692 N.W.2d 133, 137.  To decide whether the BIA intentionally and without privilege caused the third party lessees to enter the Wilkinsons' allotments requires the Court to decide whether the BIA had authority to lease the Wilkinsons' allotments.

The Secretary of the Interior, through the BIA, may lease an allotment on behalf of an Indian only when authorized by law:

> The Secretary may grant leases on individually owned land on behalf of:
> (1)   Persons who are non compos mentis;
> (2)   Orphaned minors;
> (3)   The undetermined heirs of a decedent's estate;
> (4)   The heirs or devisees to individually owned land who have not been able to agree upon a lease during the three-month period immediately following the date on which a lease may be entered into; provided, that the land is not in use by any of the heirs or devisees; and
> (5)   Indians who have given the Secretary written authority to execute leases on their behalf.

25 C.F.R. § 162.601(a) (2001).  As the IBIA opinion noted, only subsections three and five could have any relevance to this case. 32 I.B.I.A. 265, 269 (I.B.I.A. 1998).

The Eighth Circuit held the 1997 leases were unlawful. Wilkinson, 440 F.3d at 976.  The United States argues, however, that the lease must be examined on a year-to-year basis and that

the Eighth Circuit decision did not foreclose the possibility
that the leases became valid after the deaths of Ernest, Harry,
or Virginia.  See id. at 976 n.6 ("It does not follow, however,
that the Interior Board's order foreclosed the BIA from
exercising control over the land at some point following the
deaths of Ernest and Virginia." (emphasis in original)).  The
Eighth Circuit also commented on the use of Ernest's estate as a
source of undetermined heirs: "Probate was not commenced for
Ernest's estate until 2003, so it does not appear that the BIA
gained authority to lease his land as administrator or executor."
Id.  The clear import of this statement is that an estate for the
decedent must be opened and the BIA assume a personal
representative role before the BIA may exercise its authority to
lease allotments.

    The Court concludes the United States' argument regarding
the five-year leases made in 1997 is unavailing.  When the BIA
leased allotments 1366, 371, 3016, and 1357, its intent was to
benefit FSA by generating revenue to pay the outstanding FSA
debt.  The leases were not made as a personal representative of
an estate to benefit the estate of an allotee prior to a probate
distribution.  The BIA-imposed leases were made for five years
and signed in May 1997 (Exhs. D-519 to D-522).  At that time, as
the Eighth Circuit has held, the United States was plainly
without authority to lease the lands on behalf of the Wilkinsons.
However, the harm had been inflicted at that time.  The fact that
some of the allotees passed away after the leases were made is

10

fortunate for the United States in that it may make this
argument, but this argument is simply a rationalization for
unlawful conduct that had already been committed.

An analogy may be a person who intends to assault another
person.  One day, the attacker sees the targeted victim and
attacks.  Later, the attacker learns that unbeknownst at the
time, the victim also intended to assault the attacker.  Surely,
the attacker cannot now claim self defense for his wrong, relying
on a fact he was unaware of at the time.  The attacker's
motivation was to attack his target.

As it is here, the BIA's motivation was to help its fellow
governmental agency, not the estate of an allotee.  Only after
the BIA imposed on the allotee's possessory interest did the
grounds for justifying its conduct arise.  The BIA's action
caused third parties to enter and interfere with the allotments
of the Wilkinsons.  This action meets the definition of trespass
under North Dakota law.  Therefore, the Court holds the United
States committed a trespass against the Wilkinsons for allotments
1366, 371, 3016, and 1357 from 1997-2001.

The analysis for allotments 1366, 371, 3016, and 1357 is
different after the 1997 leases had expired.  By then, Virginia,
Ernest, and Harry had passed away.  Harry's estate had been
probated in August of 1998, giving his interest in allotment 3016
to Ernest's estate.  No probate was opened for Ernest's estate
until 2003, so as the Eighth Circuit noted, the BIA had no
authority to lease Ernest's allotments as the personal

representative of the estate until then.  Virginia's probate was
opened some time in 2002, so the BIA had no authority to lease
Virginia's allotments until then.  The letter sent to the non-
Indian lessees on March 24, 2003, cited the BIA's authority to
lease allotments when no heirs had been judicially determined
(Exh. P-21).  This shows the BIA had now acknowledged the proper
authority to rent the allotments.  However, the leases for
allotments 1366, 371, and 1357 state the allotments were leased
for a two year period, starting January 1, 2002, and ending
December 31, 2003.  Neither probate had been opened prior to the
effective date of these leases.  Therefore, the BIA was still
without authority to lease the allotments.  The testimony at
trial and the BIA's March 24, 2003, letter indicate allotment
3016 was leased during this time, so the Court can infer that
allotment 3016 was under a similar two-year lease, beginning
January 1, 2002.  The Court concludes these leases for 2002 and
2003 were also an unlawful trespass into the allotment interests
of the Wilkinsons because the leases were made prior to the BIA
being vested with authority to lease the property.

        The evidence indicates no allotments were leased after 2003.
Although William Huesers testified he farmed allotments 371 and
1357 in 2004, he also testified he only signed two lease
agreements.  The lease agreement for the second term ended in
2003.  Therefore, the Court finds the allotments were not farmed
from 2004-2006.

However, while these allotments may not have been leased or farmed from 2004-2006, the interference with the Wilkinsons' property rights continued.  The Wilkinsons had not been allowed to farm their property since 1997.  The Court received no evidence the BIA communicated to the Wilkinsons that the BIA would no longer lease their property after 2003 and the Wilkinsons could return to the land themselves.  The Wilkinsons, after seven years of being withheld from their land would justifiably not know that they could now return to farming unless the BIA officially informed them.  Therefore, the BIA, not the Wilkinsons, bears the fault of the land remaining idle for those three years.  The trespass continued, and the Wilkinsons are entitled to the damages stemming from this trespass.

Regarding allotment 208A-A, exhibit D-510, page 15, indicates that the property was never leased because no bids were received (Exh. D-510, p.15).  No one ever interfered with the Wilkinsons' interest in that property, so no trespass could occur.  Although the Wilkinsons chose to abandon the property, no trespass occurred because no one entered the property or deprived them of the ability to possess the property.

**B.   Conversion**

Under North Dakota law, conversion is the tortious detention of, destruction of, or wrongful exercise of dominion or control over the personal property of another.  <u>Paxton v. Wiebe</u>, 1998 ND 169, ¶ 28, 584 N.W.2d 72, 78.  It does not require a wrongful

intent, just the intent to exercise control over or interfere with an owner's use to "an actionable degree." Id.  The interference must be sufficiently severe that the Court is authorized to impose a "forced sale;" in other words, it may order the tortfeasor to pay the plaintiff the full value of the property.  Id. (citing Dairy Dept. v. Harvey Cheese, Inc., 278 N.W.2d 137, 144 (N.D.1979)); see also W. Page Keeton et al., Prosser and Keeton on Torts § 15, at 94 (5th ed. 1984) (discussing the degree of interference necessary to be a conversion).

No agency of the United States took physical possession of the Wilkinsons' equipment.  However, the leasing of their allotments had a paralyzing effect on their farming operation, even if the United States did not take all their farmland.  The BIA's deplorable actions eliminated the use of the equipment. This conduct is a sufficient exercise of dominion or control over the equipment to justify a forced sale.  Therefore, the United States converted the Wilkinsons' equipment.

The Court also notes, however, that the Wilkinsons did nothing to maintain the value of their equipment after the leases.  They allowed the equipment to be completely exposed to the elements with no attempt to remedy the effect that would have on the equipment.  This wasting of "operational" equipment is reflected in the exhibits presented to the Court (Exh. P-2). This fact will be reflected in the Court's damages calculation. The Court also notes one of the tractors, a Case model 2590, was

14

repossessed by a secured party and not by any action of the United States.  Therefore, the Wilkinsons cannot claim damages on that tractor.

    **C.   IIED**

To prove IIED under North Dakota law, a plaintiff must show the defendant (1) engaged in extreme and outrageous conduct, (2) that conduct was intentional or reckless, and (3) caused severe emotional distress.  <u>Sec. Nat'l Bank v. Wald</u>, 536 N.W.2d 924, 927 (N.D. 1995) (citing Restatement (Second) of Torts § 46 (1965)).  Contrary to the United States' suggestion, actual physical harm or a risk of physical harm is not required.  <u>Compare</u> N.D. Pattern Jury Instruction C-20.00 <u>with</u> N.D. Pattern Jury Instruction C-20.65.  "The Defendant's conduct was reckless if the Defendant had knowledge of a high degree of probability that emotional distress would result and acted with deliberate disregard of that probability or with a conscious disregard of the probable results."  <u>Id.</u> C-20.40 (citing Restatement (Second) of Torts §§ 46, cmt. i, 500, cmt. a).

The BIA acted in the best interests of the FSA, not their fiduciary trust beneficiaries, the Wilkinsons.  For years, the BIA has directly interfered with the Wilkinsons' allotment interests.  The BIA also completely ignored a directive of the IBIA.  This Court finds its actions show an extreme and outrageous disregard for our government's conflict resolution system.  Furthermore, the employees of the BIA could see their

15

defiance of the IBIA decision was resulting in great emotional angst for the Wilkinsons.  Despite this, they continued denying the Wilkinsons their allotment rights.  The Court finds the BIA acted at least recklessly.  Furthermore, the Wilkinsons would not have suffered any emotional distress without the actions of the BIA, so the BIA caused the distress.  Therefore, the Court finds the Wilkinsons have met the elements of IIED.

**D.   Wrongful Death**

The Court need spend little time discussing whether the actions of the BIA were the wrongful cause of Ernest Wilkinson's death.  The undisputed evidence showed Ernest had numerous health problems for many years, including heart attack, stroke, emphysema, congestive heart failure, diabetes, and chronic obstructive pulmonary disease ("COPD").  He was also a smoker. The causes of death listed on Ernest's death certificate were cardiorespiratory arrest and coronary artery disease.  The Wilkinsons presented no expert evidence that the actions of the BIA could be a medical cause of his death.  Based on this evidence, the Court cannot find the BIA caused Ernest's death. The Wilkinsons have failed to meet their burden of proof for wrongful death, and the claim fails.

**E.   Damages**

Three North Dakota statutes guide the Court's damages analysis.  First for torts in general, "the measure of damages . . . is the amount which will compensate for all the detriment

proximately caused thereby, whether it could have been anticipated or not."  N.D. Cent. Code § 32-03-20 (1996).  Second for wrongful occupation of realty, "The detriment caused by the wrongful occupation of real property . . . is deemed to be the value of the use of the property for the time of such occupation . . . ."  Id. § 32-03-21.  Finally for conversion, "The detriment caused by the wrongful conversion of personal property is presumed to be . . . [t]he value of the property at the time of the conversion, . . ."  Id. § 32-03-23.

### i.  Economic Damages

At trial, the Wilkinsons called an agricultural economics expert, Professor David Saxowsky of North Dakota State University, to testify regarding the value of the loss of use of the Wilkinsons' property.  Professor Saxowsky prepared two reports to aid the Court (Exh. P-30 and P-31).  In his first report, Professor Saxowsky explains his methodology, the enterprise analysis (Exhs. P-30 at 1-2).  The enterprise analysis takes into account each "enterprise" of a farm operation, calculates their average rate of return, and then totals all enterprises to yield a projected financial picture of the farm operation.  An enterprise is a specific activity within the operation.  Using this case as an example, the Wilkinsons grew durum wheat, spring wheat, oats, and flax and raised cattle. Each of these activities is its own enterprise.

Professor Saxowsky's report states the enterprise approach requires detailed information about the farm operation including acres, yields, revenues, and expenses.  He testified that when the farmer is unable to provide this detailed information, he looks to economic databases to fill in the information.  In this case, the Wilkinsons were able to provide very little information about their operation.  Therefore, Professor Saxowsky used information from the North Dakota Farm Business Management ("NDFBM") and the United States Department of Agriculture's National Agriculture Statistical Service ("NASS") databases to supplement the analysis.

Professor Saxowsky testified the NDFBM program is composed of farmers from across North Dakota.  Those farmers are divided into regions.  The Wilkinsons' farm was located in the NDFBM's south-central region, so Professor Saxowsky used statistics reported from that region for his enterprise analysis.  Professor Saxowsky testified the NDFBM program is composed of a good sample of farmers, making the statistics reliable.

Using the NDFBM statistics, Professor Saxowsky was able to determine an average rate of return on farm assets for participating farms in the south-central region.  Using the NASS database, Professor Saxowsky was able to determine an average value of farmland for the counties in the south-central region.  For the value of the Wilkinsons' equipment and farmstead, Professor Saxowsky used values Wilbur Wilkinson provided based on Wilbur's estimate of how much money would be needed to replace

the equipment and repair the farmstead.  Professor Saxowsky
multiplied these assets by the rate of return to create the
projected lost earnings for the Wilkinsons.

Professor Saxowsky's first report calculated loss assuming
the Wilkinsons' property would not be returned to them.  After
learning the property would likely be returned, Professor
Saxowsky prepared a second report (Exh. P-31).  The second report
calculates loss using the methodology described above.  Professor
Saxowsky also calculated an alternative measure of damages based
on rental income (Exh. P-31 at Second Attachment).  Professor
Saxowsky used the average rental income for 750 acres of rented
property from the NASS database to project the loss.

The United States disputes Professor Saxowsky's methodology
for several reasons: (1) the financial data used for the report
has no connection to the Wilkinson farm; (2) Professor Saxowsky
wrongly assumed the Wilkinsons were actively farming; and (3)
Professor Saxowsky's methodology is flawed because using the rate
of return to calculate loss is not an accepted practice.

During trial, the United States cross-examined Professor
Saxowsky using financial guidelines for agricultural producers
published by the Farm Financial Standards Council ("FFSC") under
Fed.R.Evid. 803(18).  Professor Saxowsky admitted that one of the
textbooks he uses relies on the FFSC and that he considered this
source reliable and authoritative.  The United States read into
the record a portion of the book that states "strict, rigid
reliance upon financial measures as a sole determinant of

financial position and financial performance is fraught with danger." Thus, the United States argues Professor Saxowsky's enterprise methodology is unreliable. However, the United States failed to present an expert providing the Court with an alternative method of calculating damages. While financial data may not be able to provide a perfect picture of what condition a business may be in, every industry experiences unknown market variables. Financial data is the best information available to the Court.

The United States also argues the financial data used in Professor Saxowsky's report is unreliable because it is based on an average farm in the south-central region, not the Wilkinsons' farm. The Court agrees. Several witnesses testified the Wilkinson farm was a below-average farm. The reports and photos received in evidence show a farming operation with a below average rate of return. Furthermore, Professor Saxowsky's report uses an equipment value based on Wilbur's estimate of what replacement equipment would cost. Under North Dakota law, conversion damages can only be "[t]he value of the property at the time of the conversion, . . ." N.D. Cent. Code § 32-03-23. Therefore, Wilbur's unsupported estimate of replacement equipment cannot be used in the calculation. The Wilkinsons can only recover the value of their equipment at the time of the conversion, adjusted for present value.

Professor Saxowsky's own report lists rates of return on assets for average, above average, and below average farms in the

south-central region.  Exh. P-30, at 4 Table 1.  Professor
Saxowsky's research shows a negative rate of return on assets for
below average farmers.  The Court finds this is the most
appropriate category for the Wilkinsons' operation.  Because
relying on an enterprise methodology with a negative rate of
return would yield a negative damage award, the Court must base
its damages calculation based on the rental value the Wilkinsons
could have received.

Professor Saxowsky's supplemental report estimates damages
based on renting the property (Exh. P-31).  The Court finds this
methodology reliable.  However, not all of the information in the
report is based on what has actually occurred in this case.
Therefore, the Court must substitute the information Professor
Saxowsky used to come to an accurate damages calculation.

The first variable that must be found is the acreage of land
for which the Wilkinsons may recover damages.  The Court has
found BIA trespass of allotments 371 (forty acres); 1357 (forty
acres); 1366 (eighty acres), which includes the five acres of
allotment 1366-A (the white house) that was never leased and
where Virgil presently lives with his family (75 acres net); and
3016 (160 acres) (Exh. P-1).  The total acreage trespassed on is
315 acres.  This is roughly forty-two percent of the 750 total
acres the Wilkinsons reported farming (Exh. P-1).  The Wilkinsons
argue damages should be based on the full 750 acres.  However,
the Court cannot justify giving trespass damages for property
that was never taken but was instead left idle by the Wilkinsons.

Therefore, the Court finds 315 acres is the proper acreage that
should be used for calculating damages.

Regarding the proper rental value per acre, the Court has
two choices.  The Court could use the rental value the BIA
actually received, or it could use the NASS average Professor
Saxowsky used.  The Court finds the NASS value is the better
evidence to calculate damages.  The BIA leases were secured
through a bid process, a process that most likely depressed the
value of what the Wilkinsons could receive if they rented the
land themselves.  Alicia Vorland, a certified general appraiser
in the state of North Dakota, testified regarding a real-estate
appraisal she conducted on the Wilkinson farm operation in 1998
(Exh. D-61).  The appraisal was prepared for the FSA and the
United States Department of Agriculture ("USDA") as a general
appraisal of the farm real estate.  Ms. Vorland testified the
property was of average to above average value for that area.
Therefore, the Court finds the NASS average rental value
accurately reflects what rental income the Wilkinsons could have
earned for average property in that area.

Regarding the value of the Wilkinsons' farm equipment,
Wilbur testified the $380,000 reflected in Exhibit P-2 was
replacement value, not actual value, of the equipment (Exh. P-2).
Under North Dakota law, they may only receive the value of the
equipment at the time as conversion damages.  N.D. Cent. Code §
32-03-23.  As the Court previously mentioned, some allowance for
the Wilkinsons' neglect is also appropriate.  Eugene Geiser, a

FSA farm loan officer, appraised the equipment in 1997 after the allotments were leased (Exh. D-541).  According to Geiser, what property he did locate was in very poor condition.  He testified the equipment was "junked" and worth only its salvage value.  However, on cross examination he testified the equipment may have been operable.  Wilbur, Virgil, and Charles all testified the equipment was operable.  The Court finds this evidence credible and concludes the equipment did have some value.  After considering Exhibits P-2 and D-541, the Court finds that $72,000 accurately reflects the value of all equipment combined.  While the appraisal indicates the equipment was only worth salvage value, it was operable at the time.  Furthermore, Geiser's appraisal indicates a lien on the property of $44,775, which indicates the FSA thought the equipment had some value.  Therefore, the Wilkinsons are entitled to $72,000 for the conversion of their equipment.

Professor Saxowsky's report also calculated $11,000 per year in actual earnings for the Wilkinsons to mitigate their damages.  The Court finds mitigating their damages in this situation is not necessary.  If we assume for calculation of damages the Wilkinsons would have rented their allotments, they each could have found other employment to earn additional money.  These actual earnings should not act to mitigate their damages because they could have earned both that income and the rental income.  Therefore, actual earnings will not mitigate their damages.

The Court finds the five percent rate Professor Saxowsky
applied to calculate present value is a justified assessment of a
potential rate of return.  The Court will use five percent per
year as the appropriate rate for present value calculations.
After considering the number of acres trespassed on, the
conversion of equipment, and the present value of those damages,
the Court finds $232,407 in economic damages accurately reflects
the harm the FSA inflicted on the Wilkinsons.

| Calculation of Rental Damages | | | | | |
|---|---|---|---|---|---|
| | Acres | Rent Per | Loss (Rounded) | Rate | Present Value |
| Equipment | | | $78,000 | 5% | $117,000 |
| 1997 | 315 | $29.16 | 9,185 | 5% | 13,778 |
| 1998 | 315 | 28.72 | 9,047 | 5% | 13,118 |
| 1999 | 315 | 26.26 | 8,272 | 5% | 11,581 |
| 2000 | 315 | 29.41 | 9,264 | 5% | 12,507 |
| 2001 | 315 | 28.61 | 9,012 | 5% | 11,716 |
| 2002 | 315 | 28.66 | 9,028 | 5% | 11,285 |
| 2003 | 315 | 25.61 | 8,067 | 5% | 9,681 |
| 2004 | 315 | 29.99 | 9,447 | 5% | 10,864 |
| 2005 | 315 | 30.97 | 9,756 | 5% | 10,731 |
| 2006 | 315 | 30.68 | 9,664 | 5% | 10,147 |
| | | | Economic Damages | | $232,407 |

However, Renita Howling Wolf, who worked for the BIA realty
department, testified only $34,580.79 of the rents received was
paid over to the FSA.  Exhs. D-567 to D-575.  The rest of the

rents received were deposited into Ernest's and Mollie's Individual Indian Money ("IIM") accounts. Howling Wolf testified the IIM accounts for Ernest, Mollie, Virginia, and Harry have since been closed and disbursed to the surviving Wilkinsons. Therefore, part of the damage inflicted has already been paid to the Wilkinsons, and the United States is entitled to a setoff of that amount. The Court's review of Howling Wolf's exhibits and testimony reveals $4,838 in rent payments were received by Ernest and Mollie and then later disbursed to the other Wilkinsons. Therefore, the economic damages of this case should be reduced by that amount for net economic damages of $227,569.

### ii.   Non-Economic Damages

The Wilkinsons, with the support of Professor Saxowsky, suggest non-economic damages should be based on the ratio of non-economic damages to economic damages from In re Warren, a USDA administrative opinion concerning denial of federal farm benefits because of race discrimination. See generally In re Warren, USDA Docket No. 1194, HUDALJ No. 00-19-NA (USDA Dec. 19, 2002). The Court rejects this argument. Using a ratio derived from a completely unrelated case wholly ignores the realities of this case or the actual emotional harm the Wilkinsons experienced.

Like Warren, however, this case also presents outrageous conduct of a governmental agency. For practical purposes, two agencies, the BIA and the FSA, conspired with each other to deprive a family of its farming operation. It did so while being

unsure of its legal ability to do so.  The BIA is supposed to act as the Wilkinsons' trustee, but instead openly ignored what may have been in the best interests of the family.  Even after the IBIA instructed the BIA that it had no legal authority to act as it had, the BIA defied its own appeal board.  When Superintendent Brunsell testified, she still insisted the BIA properly leased the land, despite contrary holdings of the IBIA and the Eighth Circuit Court of Appeals.  This demonstrates a completely willful and arrogant defiance of our country's administrative and judicial process.

Furthermore, the actions of the BIA have had lasting effects on the Wilkinsons.  Wilbur, Virgil, and Charles each testified about their pride in the family farm.  Each explained a connection with the land and a love of farming.  The stress, frustration, and anger the Wilkinsons must have felt towards the BIA, an agency that is supposed to act as their fiduciary, is indescribable.  Therefore, the distress the family endured is entitled to respect and substantial damages.  For that reason, the Court finds the Wilkinsons should be paid $232,407 for their emotional distress, an amount equal to the economic damages the Wilkinsons have endured.


## III. Conclusion

The BIA's actions were a deplorable breach of trust and a perfect example of how bureaucracy can overpower the people it is

supposed to serve.  However, the Wilkinsons have attempted to
claim more than they are entitled.  The United States, through
the BIA, committed a trespass on 315 acres and committed a
conversion of personal property.  The Clerk of Court is **ORDERED
AND DIRECTED** to enter **JUDGMENT** in favor of the Wilkinsons for a
total amount of $459,976.  The damages are to be paid to the BIA
in trust for the Wilkinsons and disbursed to the Wilkinsons
according to their legal interests in the property, which is for
them to determine, or as decided in any separate agreement the
Wilkinsons may enter into.  Each party is responsible for its own
attorney's fees.  Before disbursing the damages award to the
Plaintiffs, the BIA shall pay the Plaintiff's attorneys fees out
of the awarded damages as negotiated by the Plaintiffs and their
Attorney, mindful of the FTCA's statute addressing attorneys
fees.  28 U.S.C. § 2678 (2000).

   **IT IS SO ORDERED.**

   Dated this 9th day of November, 2007.

_Rodney S. Webb_
RODNEY S. WEBB, District Judge
United States District Court